IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JAMES M. RUSSELL,                )
     Plaintiff,                        )
                        )
v.                                            )      Civil No. 3:13cv524 (HEH)
                        )
CAROLYN W. COLVIN,               )
Acting Commissioner of Social Security,   )
     Defendant.                      )
_____)

## REPORT AND RECOMMENDATION

James R. Russell ("Plaintiff") is 34 years old and previously worked as a landscaper, a floor technician, produce clerk, sales clerk and store laborer. On April 22, 2011, Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"), claiming disability beginning March 31, 2011, due to gout, back spasms, heart palpitations, high blood pressure, anxiety and depression. After denial of his claim, Plaintiff appealed to an Administrative Law Judge ("ALJ") and Plaintiff for the first time claimed an intellectual disability. The ALJ found that Plaintiff was not disabled under the Act and thereafter the Appeals Council denied Plaintiff's request for review.

Plaintiff now challenges the ALJ's denial of benefits, arguing that the ALJ erred by finding that Plaintiff's major joint dysfunction and right knee injury were not severe impairments, by determining that Plaintiff's mental condition failed to meet listing § 12.05 and by determining that Plaintiff could perform limited work at all exertional levels, including his past relevant work. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 14) at 15-25.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The matter has been referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on Plaintiff's Motion for Summary Judgment (ECF No. 12), Plaintiff's Motion to Remand (ECF No. 13) and Defendant's Motion for Summary Judgment (ECF No. 15).[1] For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) and Plaintiff's Motion to Remand (ECF No. 13) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff challenges whether the ALJ erred by finding that Plaintiff's major joint dysfunction and right knee injury were not severe impairments, by determining that Plaintiff's condition did not meet listing § 12.05, by finding that Plaintiff could perform his past relevant work and by determining Plaintiff's Residual Functioning Capacity ("RFC"), Plaintiff's education and work histories, Plaintiff's medical history, non-treating state agency physicians' opinions, Plaintiff's function report and hearing testimony, third party reports and Vocational Expert ("VE") testimony are summarized below.

A. Plaintiff's Education and Work History

Plaintiff is 34 years old. (R. at 38.) He enrolled in special education classes throughout his school career, but he never had an Individualized Education Program ("IEP"). (R. at 22.) Plaintiff repeated the first grade. (R. at 247.) In 1999, Plaintiff received a GED or special

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

certificate rather than a diploma. (R. at 22.) Plaintiff took the written examination to obtain a driver's license and he passed on his sixth attempt. (R. at 22.) Plaintiff previously worked as a landscaper, a floor technician, a sales clerk, a store laborer and roadside clean-up crew member. (R. at 22.) Most recently, Plaintiff worked as a produce stock clerk at Walmart, but lost the job because he missed too much work. (R. at 22.)

B.  Plaintiff's Medical History

On June 9, 2010, Plaintiff sought treatment from Christopher Mullins, D.O. and complained of dizziness, numbness in his heels and joint pain. (R. at 213.) Dr. Mullins diagnosed Plaintiff with gout and noted that Plaintiff had slight puffiness in his feet, but Plaintiff demonstrated no signs of a gout flare-up. (R. at 213.) Plaintiff followed-up with Dr. Mullins on June 30, 2010, and continued to complain of numbness in his right heel and dizziness. (R. at 211.) On December 2, 2010, Plaintiff described experiencing burning and weakness in his right thigh and leg after walking, but the sensation subsided after resting. (R. at 209.) Plaintiff complained of numbness in his right leg and left arm. (R. at 209.) During Plaintiff's January 6, 2011 appointment, Plaintiff only complained of intermittent dizziness. (R. at 207.)

On February 2, 2011, Rachel Huot, M.D. noted that Plaintiff reported heart palpations, which caused his feet to go numb when his heart raced. (R. at 205.) During Plaintiff's February 11, 2011 appointment, Plaintiff described bending a lot at work, which made him feel weak afterward. (R. at 203.) Plaintiff visited Dr. Huot on March 31, 2011, and complained of left shoulder pain following an emergency room visit. (R. at 201.) Dr. Hout excused Plaintiff from work for two weeks, because his job involved lifting heavy containers. (R. at 201-02.) Plaintiff returned to the emergency room on April 15, 2011 for left arm pain and visited Dr. Huot on April

3

20, 2011 for a follow-up appointment due to continued left arm pain. (R. at 198.) Dr. Huot also reported that Plaintiff had gout and prescribed allopurinol to treat the condition. (R. at 198.)

On February 16, 2012, Plaintiff sought treatment from Jibanananda Satpathy, M.D. and complained of right knee pain from a knee injury. (R. at 233.) Plaintiff described the pain as moderate and aching, but worsening. (R. at 233.) He began feeling the pain about a week earlier. (R. at 233.) Climbing stairs and walking long distances exacerbated the pain, but rest, heat and anti-inflammatories alleviated it. (R. at 233.) Dr. Satpathy diagnosed Plaintiff with a right buck-handle medial meniscus tear. (R. at 234.) After discussing treatment options, Plaintiff decided to proceed with arthroscopic intervention, and Dr. Satpahty recommended an MRI. (R. at 234.) Plaintiff returned for a follow-up appointment on February 29, 2012, following his MRI. (R. at 231.)  The MRI revealed ACL and meniscus tears in the right knee. (R. at 231.) Plaintiff could "almost fully extend the knee," but needed crutches for mobility. (R. at 231.) Dr. Satpathy noted moderate swelling, significant tenderness and discomfort with range of motion. (R. at 231.) Dr. Satpathy recommended a knee brace, ice, elevation and possible ACL reconstruction surgery. (R. at 231-32.)

Dr. Satpathy referred Plaintiff to Seth A. Cheatham, M.D. for further examination. (R. at 236.) Plaintiff's injury stemmed from Plaintiff twisting his knee while chasing pigs at his family farm. (R. at 236.) Dr. Cheatham indicated that Plaintiff's pain had subsided since the injury, but Plaintiff still experienced a restricted range of motion. (R. at 236.) Plaintiff rated his pain as a five on a scale of one to ten. (R. at 236.) He used one crutch to ambulate, but did not take any pain medication. (R. at 236.) Plaintiff's knee had no swelling. (R. at 236.) Dr. Cheatham and Plaintiff discussed surgical plans to mend the meniscus and ACL tears, and Plaintiff planned to undergo the procedure. (R. at 237.)

On May 25, 2012, Plaintiff underwent a psychological examination by Chris Cousins, Ph.D. (R. at 224.) During the examination, Plaintiff appeared to put forth a good effort and Dr. Cousins observed no abnormalities in mood or affect. (R. at 224.) Plaintiff's speech was clear and Plaintiff was articulate. (R. at 224.) Plaintiff's full scale IQ score measured at 59. (R. at 225.) Although Dr. Cousins indicated that Plaintiff's IQ score fell within the mild range for mental retardation, Plaintiff's work history suggested that Plaintiff could function at a "slightly higher level" than his score suggested. (R. at 226.) Therefore, Dr. Cousins diagnosed Plaintiff with borderline intellectual functioning. (R. at 226.) Dr. Cousins opined that Plaintiff could perform simple repetitive tasks and may require supervision when performing new tasks, but could perform the tasks independently once learned. (R. at 226.) Plaintiff would likely experience "no more than mild impairment" in completing a normal workday and workweek without interruptions. (R. at 226.) Dr. Cousins further determined that Plaintiff could accept instructions and interact appropriately with co-workers and the public, but he would likely have moderate difficulty coping with typical stressors brought on by competitive work. (R. at 227.)

C. Function Report

On May 26, 2011, Plaintiff completed a Function Report and indicated that he lived in a house with his family. (R. at 178.) Each day, Plaintiff woke up, brushed his teeth, ate breakfast, bathed, took medicine, watched television, socialized with his family, went outside, ate dinner and went to bed. (R. at 178.) Plaintiff took care of his child by doing whatever was needed. (R. at 179.) Though Plaintiff's condition affected his ability to sleep, he had no problem tending to his own personal care and could do so without needing reminders. (R. at 179-80.) However, he needed reminders to take his medications. (R. at 180.)

Plaintiff did not prepare any food for himself, perform household chores or do yard work, because he became dizzy from standing too long. (R. at 180-81.) Plaintiff sometimes went outside and would drive or ride in a car without needing anyone to accompany him. (R. at 181-82.) Plaintiff could go out alone. (R. at 181.) Although Plaintiff did not shop, he could pay bills, count change, handle a savings account and use a checkbook. (R. at 181.) Plaintiff indicated that he went fishing every once in a while, but had not recently. (R. at 182.) He spent time with others by talking with them and had no problem getting along with people. (R. at 182.) He did not need reminders to go places. (R. at 182.)

Plaintiff marked that his condition affected his ability to lift, walk, climb stairs, bend, stand and complete tasks. (R. at 183.) He had no difficulty squatting, sitting, kneeling, reaching, using his hands, seeing, following instructions, remembering, talking, hearing and concentrating. (R. at 183.) Plaintiff could lift about five to ten pounds and stand for about five to ten minutes. (R. at 183.) Standing caused him back pain and bending caused dizziness. (R. at 183.) Plaintiff sometimes finished what he started, but could not follow instructions or handle stress well. (R. at 183-84.) He was "okay" at handling changes in his routine. (R. at 184.) Plaintiff got along with authority figures "very well" and had never been fired from a job because of problems getting along with others. (R. at 184.)

D. Plaintiff's Testimony

On June 8, 2013, Plaintiff, represented by counsel, testified at a hearing in front of an ALJ. (R. at 238-39.) Plaintiff stated that he completed high school and attended special education classes. (R. at 247.) He repeated the first grade and had difficulty reading and writing. (R. at 247.) He attended special education during his entire time in school and graduated with his GED. (R. at 254.) After graduating, Plaintiff lived with his parents before

6

moving to live with his wife at his wife's parents' home. (R. at 263-64.) For a time, Plaintiff

and his wife lived in a hotel. (R. at 264.) At the time of the hearing, Plaintiff lived with his wife

and four-year-old daughter. (R. at 265.) Plaintiff helped care for his daughter. (R. at 265.)

Plaintiff worked as a landscaper, at a cleaning company and as a floor technician, but he

did not stay in these jobs long, because he missed too many days of work due to his gout. (R. at

249-50.) He could understand some of the tasks required of the job. (R. at 250.) He last worked

as a produce stocker at Walmart, but previously worked as a retail salesmen there as well. (R. at

256, 273.) Plaintiff could drive, but only short distances due to problems staying awake. (R. at

253.) Typically, his wife drove him. (R. at 254.)

Plaintiff had his wife complete his social security forms, because he had difficulty

understanding them. (R. at 267-68.) Plaintiff used to fish daily, but had not been fishing in three

years. (R. at 267.) Plaintiff sometimes socialized with friends at his house on the weekend and

would drink five or six beers. (R. at 270.)

During the hearing, Plaintiff walked with a crutch. (R. at 247-48.) He suffered from gout

in his right foot and hypertension. (R. at 248.) Sometimes he could not wear a shoe because of

the gout. (R. at 248.) He underwent treatment with cortisone shots in his feet, which helped the

pain for a while. (R. at 248-49.) Plaintiff had difficulty walking, because his feet swelled and

his right leg felt numb. (R. at 251.) He could not stand for too long before having to sit down

and could walk about half a football field before becoming out of breath. (R. at 251-52.)

Plaintiff did not perform any house work. (R. at 253.)

E. Third-Party Function Report

On May 27, 2011, Plaintiff's aunt, Ellen Bernice Alexander, completed a third-party

Function Report. (R. at 165-75.) Ms. Alexander knew Plaintiff for 31 years and saw him daily.

(R. at 165.) She reported that she was unsure how Plaintiff spent his day, but indicated that Plaintiff took care of his children. (R. at 166.) Plaintiff's condition affected his ability to sleep. (R. at 167.) He had no difficulty dressing himself, bathing, shaving, caring for his hair, feeding himself or using the toilet, and did not need reminders to tend to his personal needs. (R. at 167-68.) However, he needed reminders to take his medicine. (R. at 168.)

Plaintiff did not cook for himself and performed no chores or yard work, because it caused shortness of breath along with leg and chest pain. (R. at 168.) Plaintiff spent time outside daily by sitting on the porch. (R. at 169.) Plaintiff could go out alone and could drive. (R. at 169.) He did not shop, but could pay bills and count change. (R. at 170.) Plaintiff did not use a checkbook or handle a savings account, because he did not have them. (R. at 170.) Ms. Alexander listed fishing as Plaintiff's hobby, but noted that Plaintiff did not fish often because of pain. (R. at 170.)

Plaintiff spent time socializing with others often and had no difficulty getting along with family, friends and neighbors. (R. at 171.) Ms. Alexander marked that Plaintiff's condition affected his ability to lift, stand, kneel, walk, squat, sit and climb stairs. (R. at 171.) However, he had no difficulty using his hands, bending, seeing, remembering, hearing, concentrating, reaching, talking, completing tasks, understanding and following instructions. (R. at 171.) Plaintiff could finish what he started and followed spoken instructions very well. (R. at 172.) Plaintiff also got along with authority figures very well. (R. at 172.) He handled changes in his routine "okay," but did not handle stress well. (R. at 173.)

F. Non-treating State Agency Physicians

On June 13, 2001, James Darden, M.D. reviewed the record and opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently. (R. at 34-35.) Plaintiff could

stand and/or walk for about six hours and sit for about six hours during an eight-hour day. (R. at 35.) He was unlimited in his ability to push and/or pull, and he experienced no postural, manipulative, visual, communicative or environmental limitations. (R. at 35.) Dr. Darden also opined that Plaintiff could not perform his past relevant work. (R. at 36.) Ralph Hellams, M.D. confirmed Dr. Darden's opinions. (R. at 54-56.)

On June 13, 2011, Alan Entin, Ph.D. reviewed the record and opined that Plaintiff suffered an impairment of major joint dysfunction and further indicated that Plaintiff's condition was severe. (R. at 33.) Dr. Entin analyzed Plaintiff's anxiety disorders under listing § 12.06 and opined that Plaintiff did not meet the criteria of the listing. (R. at 33.) Specifically, Dr. Entin determined that Plaintiff had no restrictions in his activities of daily living, no difficulties maintaining concentration, persistence or pace, and experienced no repeated, extended episodes of decompensation. (R. at 33.) Plaintiff had mild difficulties in maintaining social functioning. (R. at 33.) Dr. Entin did not analyze Plaintiff's condition under listing § 12.05. (R. at 33.) Eric Orritt, Ph.D. made the same determinations. (R. at 52.)

G. Vocational Expert Testimony

During a hearing on June 8, 2013, a VE testified. (R. at 271.) The VE indicated that Plaintiff's previous work experience included working as a produce clerk, a floor technician, landscaper, sales attendant and a store laborer. (R. at 273-74.) The VE classified the work of a sales attendant as light exertional, unskilled work and the remaining jobs as medium exertional, unskilled work. (R. at 272-74.) However, the VE noted that Plaintiff's actual work as a floor technician and a landscaper would be classified as light work. (R. at 273-74.) The ALJ asked the VE if a person, who could perform simple, repetitive, low stress, non-production rate work, could perform Plaintiff's past work as actually performed by Plaintiff and generally performed in

the national economy. (R. at 274.) The VE responded that such a person could perform that work. (R. at 274.)

The ALJ then asked the VE if a person, who could perform simple, repetitive, low stress, non-production rate, light work, could perform Plaintiff's past relevant work. (R. at 274.) The VE indicated that such person could work in Plaintiff's past positions as a cleaner and landscaper as he actually performed in those jobs and could work as a sales attendant or sales clerk as the job is generally performed in the national economy. (R. at 275.) Next, the ALJ asked if a person with those same exertional limitations, who must avoid concentrated exposure to respiratory irritants, could perform Plaintiff's past relevant work. (R. at 275.) The VE testified that such a person could not be a cleaner or a landscaper, but could work as a sales clerk. (R. at 275.)

Finally, the ALJ asked the VE if a person with the same age as Plaintiff, with the same educational and occupational background as Plaintiff, who could perform simple, repetitive, non-production, light work, could perform jobs that existed in significant numbers in the national economy. (R. at 276.) The VE opined that such a person could work as a packer, inspector grader and laundry worker. (R. at 276.) The VE noted that someone with an IQ of 59 could likely perform all of Plaintiff's past relevant work, but may struggle working as a sales clerk. (R. at 277-78.)

## II.    PROCEDURAL HISTORY

On April 22, 2011, Plaintiff filed for SSI and DIB stemming from gout, back spasms, heart palpitations, high blood pressure, anxiety and depression with an alleged onset date of March 31, 2011. (R. at 13.) His application was denied both initially and upon reconsideration. (R. at 136-40, 147-49.) On June 8, 2012, an ALJ held a hearing during which Plaintiff, represented by counsel, and a VE testified. (R. at 238-80.) During the hearing, Plaintiff raised

the issue of intellectual disability for the first time. (R. at 246.) The ALJ issued a written

opinion finding that Plaintiff had a severe impairment in the form of borderline intellectual

functioning, but was not disabled under the Act. (R. at 13-28.) The Appeals Council denied

Plaintiff's request for review, rendering the ALJ's decision the final decision of the

Commissioner. (R. at 4-7.)

### III. QUESTIONS PRESENTED

1. Did the ALJ err in finding that Plaintiff's major joint dysfunction and right knee injury were not severe impairments?

2. Did the ALJ err in finding that Plaintiff's condition failed to meet listing § 12.05?

3. Does substantial evidence support the ALJ's determination that Plaintiff could perform simple, repetitive work at all exertional levels?

4. Does substantial evidence support the ALJ's determination that Plaintiff could perform his past relevant work?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to

determining whether substantial evidence in the record supports the Commissioner's decision

and whether the proper legal standards were applied in evaluating the evidence. *Hancock v.

Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the

kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion.

*Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S.

389, 401 (1971)).

To determine whether substantial evidence exists, the Court must examine the record as a

whole, but may not "undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. An ALJ conducts the analysis for the Commissioner, and a court must examine that process on appeal to determine whether the ALJ applied the correct legal standards and whether substantial evidence on the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 416.920(b), 404.1520(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for

12

"pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of

oneself, performing household tasks or hobbies, therapy or school attendance, and the like are

not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's

work constitutes SGA, the analysis ends and the claimant must be found "not disabled,"

regardless of any medical condition. *Id.*

If the claimant establishes that he did not engage in SGA, the second step of the analysis

requires him to prove that he has "a severe impairment . . . or combination of impairments which

significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R.

§ 416.920(c); 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to

benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20

C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment

listed in 20 C.F.R. part 404, subpart P, appendix 1 (listing of impairments) and lasts, or is

expected to last, for twelve months or result in death, it constitutes a qualifying impairment and

the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or

equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must

determine whether the claimant can return to his past relevant work[2] based on an assessment of

the claimant's RFC[3] and the "physical and mental demands of work [the claimant] has done in

---

[2]      Past relevant work is defined as SGA in the past fifteen years that lasted long enough for
an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[3]      RFC is defined as "an assessment of an individual's ability to do sustained work-related
physical and mental activities in a work setting on a regular and continuing basis. A 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."
SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to
perform sustained work activities in an ordinary work setting on a regular and continuing basis
(*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum

the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

### A. The ALJ's Opinion

Plaintiff, represented by counsel, appeared before the ALJ by videoconference for a hearing on June 8, 2012. (R. at 13.) An impartial VE also appeared at the hearing. (R. at 13.)

---

amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.*

On June 29, 2012, the ALJ issued a written opinion, determining that Plaintiff was not disabled under the Act. (R. at 28.) The ALJ followed the five-step sequential evaluation process as established by the Act when analyzing whether Plaintiff was disabled. (R. at 15-28.)

At the first step of the analysis, the ALJ determined that Plaintiff meets the insured status requirement through December 31, 2015, and that Plaintiff had not engaged in substantial gainful activity since March 31, 2011 — Plaintiff's alleged onset date. (R. at 15.) At step two, the ALJ determined that Plaintiff suffered a severe impairment in the form of borderline intellectual functioning. (R. at 15-16.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listings in 20 C.F.R. part 404, subpart P, appendix 1. (R. at 16.) In doing so, the ALJ considered Plaintiff's condition under listing § 12.05(B) and (C). (R. at 16-20.)

The ALJ then determined that Plaintiff maintained the RFC to perform a full range of work at all exertional levels, so long as it was limited to simple, repetitive, and non-production rate tasks. (R. at 20.) In reaching this conclusion, the ALJ considered Plaintiff's testimony and objective medical evidence, as well as opinion evidence from state agency consultants and Plaintiff's treating medical sources. (R. at 25-26.) At step four, the ALJ found that Plaintiff could perform his past relevant work as a landscaper, floor technician, produce stock clerk, sales clerk and store laborer — both as actually performed and as generally performed in the national economy. (R. at 26.) The ALJ went on to conclude that even if limited to light work as suggested by the State Disability Determination Service ("DDS"), Plaintiff would remain capable of performing his past relevant work as a landscaper, floor technician and sales clerk. (R. at 26.) Therefore, the ALJ found that Plaintiff was not disabled under the Act. (R. at 28.)

Plaintiff challenges the ALJ's conclusion by arguing that that the ALJ erred by finding that Plaintiff's major joint dysfunction and right knee injury were not severe impairments, by determining that Plaintiff's mental condition failed to meet listing § 12.05 and by determining that Plaintiff could perform limited work at all exertional levels, including his past relevant work. (Pl.'s Mem. at 15-25.)

B. The ALJ did not err in finding that Plaintiff's right knee injury and major joint dysfunction were not severe impairments.

Plaintiff argues that the ALJ erred by finding that Plaintiff's right knee injury and major joint dysfunction were not severe impairments. (Pl.'s Mem. at 15-18.) Defendant contends that substantial evidence supports the ALJ's determination, because Plaintiff's knee injury was not expected to last one year and Plaintiff's major joint dysfunction did not significantly limit Plaintiff's ability to perform basic work. (Def.'s Mem. 10-14.)

The second step of the ALJ's sequential analysis requires Plaintiff to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). Under the Act, a severe impairment that entitles one to benefits must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c). Likewise, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [Plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). To qualify as a severe impairment that entitles one to benefits under the Act, medical evidence must demonstrate that the condition causes more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c); SSR 96-4p.

The regulations require that Plaintiff be found not disabled at step two if he "do[es] not have a severe medically determinable physical or mental impairment that meets the duration

requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). Section 404.1509 requires that Plaintiff's impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. Plaintiff has the burden of demonstrating that an impairment is severe. *Yuckert*, 428 U.S. at 146.

Here, the ALJ determined that Plaintiff suffered a severe impairment in the form of borderline intellectual functioning. (R. at 16.) However, the ALJ noted that Plaintiff experienced other impairments that he found to be non-severe. (R. at 16.) The Court will address each alleged ailment.

1. Knee Injury

Substantial evidence supports the ALJ's determination that Plaintiff's knee injury was not severe, because it did not exist or was not expected to exist for a continuous 12-month period. Plaintiff sustained a knee injury in February 2012 that stemmed from Plaintiff twisting his knee while chasing pigs at his family farm. (R. at 236.) An MRI revealed an ACL and meniscus tear. (R. at 231.) By March 5, 2012, Plaintiff's pain level had subsided to five on a scale of one to ten. (R. at 236.) Although Plaintiff still experienced range of motion problems, his knee had no swelling. (R. at 236.) He did not take any pain medication. (R. at 236.) Dr. Cheatham recommended surgery to mend the meniscus and ACL tears. (R. at 237.) However, no other objective medical evidence addresses Plaintiff's knee injury. Plaintiff did not testify about his knee injury during the hearing. Further, no doctor opined that Plaintiff's injury would last for more for 12 months. Therefore, substantial evidence indicates that Plaintiff's knee injury did not or would not last for a continuous period of 12 months.

2. Major Joint Dysfunction

Substantial evidence also supports the ALJ's determination that Plaintiff's major joint dysfunction was not a severe impairment, because Plaintiff did not experience recent gout flares, and because the ailment did not require significant medical treatment or result in any continuous limitations, and it responded to medication.

On June 9, 2010, Dr. Mullins diagnosed Plaintiff with gout.[4] (R. at 214.) Dr. Mullins indicated that although Plaintiff had slight puffiness in his feet, Plaintiff demonstrated no signs of a gout flare-up. (R. at 213.) During Plaintiff's next appointments, though Dr. Mullins noted Plaintiff had a history of gout, Dr. Mullins made no assessment or diagnosis of gout at that time. (R. at 209-12.) Dr. Huot also reported that Plaintiff had gout and prescribed allopurinol to treat the condition. (R. at 198.) Plaintiff testified that he underwent treatment with cortisone shots in his feet, which helped the pain. (R. at 248-49.) No mention of gout flare-ups exist within Plaintiff's medical records and Plaintiff's doctors made no mention of treatment required due to Plaintiff's gout. Further, Plaintiff's doctors place no limitations on Plaintiff's abilities regarding his gout. As such, substantial evidence supports that ALJ's basis for finding that Plaintiff's major joint dysfunction did not constitute a severe impairment.

---

[4]     While Defendant argues that the medical records never make any mention of a joint disorder and that no state agency physician or even the ALJ identified a joint disorder, the ALJ and medical records note that Plaintiff experienced gout. (R. at 16, 209-214.) Gout is "a group of disorders of purine metabolism, manifested by various combinations of (1) hypericemia and uric acid calculi; (2) recurrent acute inflammatory arthritis induced by crystals of monosodium urate monohydrate; and (3) tophaceous deposits of these crystals in and around the joints of the extremities, sometimes causing crippling destruction of the joints." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1900 (32d ed. 2012).

C. The ALJ did not err in determining that Plaintiff did not meet the requirements of listing § 12.05.

Plaintiff argues that the ALJ erred in finding that Plaintiff's condition did not meet listing § 12.05(B), (C) or (D) for an intellectual disability, because the ALJ based his determination solely on the basis that Plaintiff only first alleged the disability at the hearing and because Plaintiff demonstrated deficits in adaptive functioning. (Pl.'s Mem. at 18-22.) Defendant maintains that the ALJ did not err in determining that Plaintiff's condition did not meet the listing. (Def.'s Mem. at 15-20.)

1. Borderline Intellectual Functioning

As an initial matter, Plaintiff was never diagnosed with an intellectual disability. The ALJ found that Plaintiff had a severe impairment in the form of borderline intellectual functioning and noted that Plaintiff had never been diagnosed with mental retardation. (R. at 15, 18.) Substantial evidence supports the ALJ's determination that Plaintiff had borderline intellectual functioning rather than mental retardation or an intellectual disability.

The term intellectual disability replaced the term "mental retardation" that was used in previous versions of the listings. DSM-5 33 (American Psychiatric Association 2013). A diagnosis of borderline intellectual functioning is "mutually exclusive of mental retardation." *Jordan v. Comm'r of Soc. Sec.*, 470 F. App'x 766, 768-69 (11th Cir. 2012). A diagnosis of mental retardation requires that Plaintiff exhibit deficits in adaptive behavior. DSM-5 33. Plaintiff was diagnosed with borderline intellectual functioning, rather than mental retardation or an intellectual disability, because Plaintiff demonstrated the ability to function at a level higher than his IQ score of 59 indicated. (R. at 226.) And as set forth below, substantial evidence supports the finding that Plaintiff did not have deficits in adaptive functioning.

19

2. Listing § 12.05

Plaintiff bears the burden of proving that he meets or equals a listing. *Yuckert*, 482 U.S. at 146 n.5. The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

The listing for an intellectual disability requires Plaintiff's condition to satisfy the "diagnostic description of the introductory paragraph and one of four sets of criteria" set forth in paragraphs A through D to meet the listing requirements. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.  Specifically, to meet listing § 12.05, Plaintiff must demonstrate:

> significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> or
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> or
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
>> 1. Marked restriction of activities of daily living; or
>>
>> 2. Marked difficulties in maintaining social functioning; or

20

3. Marked difficulties in maintaining concentration, persistence, or pace;

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. Thus, to meet the listing, Plaintiff must demonstrate a significantly subaverage general intellectual functioning with deficits in functioning before age 22 along with the requirements of one of either subsection A, B, C or D. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00; 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

Deficits in functioning "limit functioning in one or more activities of daily living, such as communication, social participation and independent living." DSM-5 33 (American Psychiatric Association 2013). "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002).

Here, the ALJ found that Plaintiff's condition did not meet listing § 12.05(B), (C) or (D). (R. at 16-20.) The ALJ questioned the validity of Plaintiff's IQ score of 59, but nevertheless found that Plaintiff did not meet the listing requirements, because he did not have deficits in adaptive functioning. (R. at 19.) In finding that Plaintiff did not have deficits in adaptive functioning, the ALJ noted that Plaintiff first raised the issue of mental retardation at the hearing and the DDS did not have the opportunity to develop the record. However, the ALJ determined that Plaintiff did not meet the listing, because any deficits required to meet the listing would have been lifelong to the extent that Plaintiff should have known of this condition before the hearing. (R. at 18.) Further, the ALJ found that the record failed to demonstrate deficits in adaptive

21

functioning manifesting before the age of 22, because Plaintiff could tend to his personal needs, care for his child, manage his finances, drive and go out alone. (R. at 18-19.)

Substantial evidence supports the ALJ's determination that Plaintiff did not meet listing § 12.05 on the basis that Plaintiff did not demonstrate deficits in adaptive functioning. Although Plaintiff argues that he attended special education classes, enrollment in special education classes and the failure to complete high school does not alone establish deficits in adaptive functioning. *Faulcon v. Comm'r of Soc. Sec. Admin*, 2013 WL 1163500, at * 2 (D. Md. Mar. 18, 2013); *Milstead v. Astrue*, 2012 WL 5285667 at *3 (W.D.Va. Oct. 23, 2012). Moreover, the ALJ considered Plaintiff's educational records and special education classes. (R. at 19.) Also, the record demonstrates that Plaintiff was enrolled in special education classes throughout his school career, but he never had an Individualized Education Plan. (R. at 22.) Further, Plaintiff earned a GED and passed the written examination to obtain a driver's license. (R. at 22.)

Additionally, Plaintiff fished daily. (R. at 267.) Plaintiff had never been fired from a job because of problems getting along with others. (R. at 184.) No further evidence in the record exists to demonstrate that Plaintiff experienced deficits of adaptive functioning before age 22. And it bears repeating that Plaintiff bears the burden of proving that he meets or equals a listing. *Yuckert*, 482 U.S. at 146 n.5. Because the evidence relied upon by Plaintiff and considered by the ALJ does not demonstrate deficits in adaptive functioning and no evidence exists in the record to show that any deficits existed before age 22, the ALJ did not err in finding that Plaintiff did not have deficits in adaptive functioning as required to meet all subsections of listing § 12.05.[5]

_____

[5]    Plaintiff argues in the alternative that the ALJ should have ordered Plaintiff to undergo a consultative examination, as the record was not fully developed as to Plaintiff's alleged mental retardation, because Plaintiff only obtained counsel at the hearing stage in the litigation. (Pl.'s

D.  Substantial evidence supports the ALJ's determination that Plaintiff could perform limited work at all exertional levels.

Plaintiff argues that the ALJ erred in assessing Plaintiff's RFC and determining that

Plaintiff could perform his past relevant work, because he failed to take into account Plaintiff's

joint dysfunction and knee injury. (Pl.'s Mem. at 24-25.)  Defendant maintains that substantial

evidence supports the ALJ's determination. (Def.'s Mem. at 24.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant

can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20

C.F.R. §§ 416.920(e)-(f), 416.945(a)(1).  In analyzing a claimant's abilities, an ALJ must first

assess the nature and extent of the claimant's physical limitations and then determine the

claimant's RFC for work activity on a regular and continuing basis.  20 C.F.R. § 404.1545(b).

Generally, the claimant bears the responsibility to provide the evidence that the ALJ utilizes in

making his RFC determination; however, before a determination is made that a claimant is not

---

Mem. at 23-24.)  Although the Commissioner has the duty to develop the record, he is not required to act as Plaintiff's counsel. *See Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994) ("[T]he ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record."); *see also Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. 1995) (citing *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)).  Here, Plaintiff was represented at the hearing (R. at 23) and, therefore, had the opportunity to develop the record.  Indeed, Plaintiff bears the burden of producing evidence of his alleged disability. 42 U.S.C. §423(d)(5)(A).

Moreover, further evidence is not necessary when substantial evidence exists in the record to support the ALJ's determination. *See Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012) (no ambiguity exists to require additional evidence from a consultative examination if substantial evidence from the developed record supports the ALJ's determination); *see also Foster v. Halter*, 279 F.3d 348, 355-56 (6th Cir. 2001) (finding that the court did not abuse its discretion by refusing to order an additional consultative exam for IQ evaluation when substantial evidence already existed in the record to demonstrate that the claimant did not experience deficits in adaptive functioning and could not meet listing § 12.05).  Here, substantial evidence supports the ALJ's determination that Plaintiff did not suffer from adaptive deficits as required to meeting the listing and, therefore, additional consultative examinations were not necessary.

disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. 20 C.F.R. § 404.1545(e).

The ALJ found that Plaintiff maintained the ability to perform a full range of work at all exertional levels with only non-exertional limitations. Plaintiff was limited to simple, repetitive, low-stress, non-production rate work. (R. at 20.) In making this determination, the ALJ considered all symptoms and evidence as required under 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96-4p and 96-7p. (R. at 20.) Substantial evidence supports the ALJ's determination.

Plaintiff argues that the ALJ failed to take into account the limitations caused by Plaintiff's joint dysfunction and knee injury, because they were severe impairments. (Pl.'s Mem. at 24-25.) However, as previously discussed, Plaintiff's gout and knee injury did not constitute severe impairments under the Act, because the severity of these conditions was not supported by the objective medical evidence, as Plaintiff did not demonstrate that they would last for a continuous period of twelve months. Therefore, the ALJ did not err in failing to consider Plaintiff's major joint dysfunction and knee injury when formulating Plaintiff's RFC.

Further, substantial evidence establishes that Plaintiff maintained the RFC to perform limited work at all exertional levels. Specifically, substantial evidence in the record supports that Plaintiff had no physical limitations and could work at all exertional levels. First, Plaintiff had no severe physical impairments. And none of Plaintiff's treating physicians listed any long-term

24

physical limitations.[6] Though Plaintiff injured his knee, surgery could fix such injury. (R. at 237.)

Further, Plaintiff's admitted activities of daily living indicate that Plaintiff had no physical limitations. Plaintiff lived with his wife and four-year-old daughter for whom he helped care. (R. at 265.) Plaintiff took care of his child by doing whatever was needed. (R. at 179.) Plaintiff could drive or ride in a car without needing anyone to accompany him. (R. at 181.) He went fishing every once in a while, but had not been recently. (R. at 182.) He marked that he had no difficulty squatting, sitting, kneeling, reaching or using his hands. (R. at 183.) Additionally, Plaintiff sustained the injury while chasing pigs at his family farm. (R. at 236.) Plaintiff's aunt indicated that Plaintiff took care of his children. (R. at 166.) He had no difficulty tending to his personal needs. (R. at 167.) Plaintiff could go out alone and could drive. (R. at 169.) Plaintiff had no difficulty using his hands, bending and reaching. (R. at 171.) Therefore, substantial evidence supports the ALJ's determination that Plaintiff could perform work at all exertional levels.

Substantial evidence also supports the ALJ's determination that Plaintiff was limited to simple, repetitive, low stress, non-production rate work. Dr. Cousins opined that Plaintiff could perform simple repetitive tasks, could accept instructions and interact appropriately with co-workers and the public, but he would likely have moderate difficulty coping with typical stressors brought on by competitive work. (R. at 226-27.) Dr. Entin and Dr. Orritt opined that Plaintiff had no restrictions in his activities of daily living, no difficulties maintaining

---

[6]     Non-treating state agency physicians, Dr. Darden and Dr. Hellams, assessed that Plaintiff experienced some physical limitations, but the ALJ declined to adopt their opinions regarding Plaintiff's physical limitations on the basis that the record did not reflect severe physical impairments. (R. at 25.) Plaintiff did not challenge the weight assigned to the state agency physicians' opinions.

concentration, persistence or pace, and experienced no repeated, extended episodes of decompensation.  (R. at 33, 52.)

Plaintiff's admitted activities of daily living also support the ALJ's determination regarding Plaintiff's non-exertional limitations.  Plaintiff could drive, go out alone and did not need reminders to go places.  (R. at 181-82.)  He spent time caring for his daughter.  (R. at 179.) Plaintiff could pay bills, count change, handle a savings account and use a checkbook.  (R. at 181.)  He spent time with others by talking with them, had no problem getting along with people including authority figures, and had never been fired from a job due to problems getting along with others.  (R. at 182, 184.)  He had no difficulty seeing, following instructions, remembering, talking, hearing and concentrating.  (R. at 183.)  He was "okay" at handling changes in his routine.  (R. at 184.)  Plaintiff testified that he socialized with friends on weekends and would drink beer with them.  (R. at 270.)

Plaintiff's aunt indicated that Plaintiff socialized often and got along well with others. (R. at 171.)  She further indicated that Plaintiff had no difficulty remembering, hearing, concentrating, talking, completing tasks, understanding and following instructions.  (R. at 171.) Plaintiff could finish what he started, followed spoken instructions very well, got along with authority figures and could handle changes in his routine.  (R. at 172-73.)  Therefore, substantial evidence supports the ALJ's determination that Plaintiff could perform limited work at all exertional levels.

E.  Substantial evidence supports the ALJ's determination that Plaintiff could perform his past relevant work as a landscaper, produce clerk, store laborer, floor technician and sales clerk.

Plaintiff argues that ALJ erred in finding that Plaintiff could perform his past relevant work, because the based his determination upon an incorrect RFC that failed to take into account Plaintiff's physical impairments. (Pl.'s Mem. at 16-18.) Defendant maintains that substantial evidence supports the ALJ's determination that Plaintiff could perform his past relevant work, because the ALJ based his determination upon the correct RFC. (Def.'s Mem. at 14-15.)

In determining whether Plaintiff can perform his past relevant work, the ALJ must assess the claimant's RFC and past relevant work to determine if the claimant is able to perform the tasks of his previous employment. 20 C.F.R. § 404.1520(a)(4)(iv). In assessing Plaintiff's ability to perform his past relevant work, the Commissioner may rely on the general job categories of the DOT as presumptively descriptive of a claimant's prior work. *See* SSR 82-61 ("The Dictionary of Occupational Titles (DOT) descriptions can be relied upon – for jobs that are listed in the DOT – to define the job as it is usually performed in the national economy.")

Here, the ALJ correctly found that Plaintiff maintained the ability to perform a full range of work at all exertional levels with only non-exertional limitations. Plaintiff was limited to simple, repetitive, low stress, non-production rate work. (R. at 20.) Plaintiff's past work included working as a landscaper, floor technician, produce clerk, sales clerk and store laborer. (R. at 26.) These were unskilled jobs requiring medium and light work. (R. at 26.) Unskilled work requires "understanding, remembering, and carrying out simple instructions, making judgments that are commensurate with the functions of unskilled work — *i.e.*, simple work-related decisions, responding appropriately to supervision, co-workers and usual work situations, dealing with changes in a routine work setting." SSR 96-9. Light work requires lifting "no more

27

than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds." SSR 83-10.  These jobs also require "a good deal of walking or standing." *Id.* Medium work requires lifting no more than 50 pounds at a time, frequently carrying or lifting 25 pounds and "standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday." *Id.*

As set forth above, substantial evidence demonstrated that Plaintiff had no exertional limitations and could perform work at all exertional levels.  Because Plaintiff's correctly determined RFC did not preclude Plaintiff from medium and light exertional jobs, Plaintiff maintained the physical ability to perform his past relevant work requiring medium and light exertion.

Further, Plaintiff maintained the ability to perform unskilled work.  Dr. Cousins opined that Plaintiff could perform simple repetitive tasks and may require supervision when performing new tasks, but could perform the tasks independently once learned.  (R. at 226.)  Further, Plaintiff could accept instructions and interact appropriately with co-workers and the public.  (R. at 227.)  Plaintiff cared for his child and had no difficulty tending to his own personal care without needing reminders.  (R. at 179-80.)  He could drive and could go out alone.  (R. at 181-82.)  He could pay bills, count change, handle a savings account and use a checkbook.  (R. at 181.)  He spent time with others by talking with them and had no problem getting along with others.  (R. at 182.)  He did not need reminders to go places.  (R. at 182.)  Plaintiff had no difficulty following instructions, remembering, talking, hearing and concentrating.  (R. at 183.)

Finally, substantial evidence supports the ALJ's determination that Plaintiff could perform his past relevant work.  Based upon a hypothetical that contained Plaintiff's correct RFC, the VE testified that a person with such abilities could work as a floor technician and landscaper as actually performed by Plaintiff and as generally performed in the economy.  (R. at

28

274-75.)  The VE also provided that a person with Plaintiff's RFC could perform the work of a cleaner and landscaper in the manner as actually performed by Plaintiff and could work as a sales attendant or sales clerk in the manner that the job is generally performed in the national economy.  (R. at 275.)   Therefore, the ALJ did not err in determining that Plaintiff could perform his past relevant work.

## VI. CONCLUSION

Based on the foregoing analysis, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) and Motion to Remand (ECF No. 13) be DENIED; Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED; and the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Opinion electronically, send a copy to the Honorable Henry E. Hudson and notify all counsel accordingly.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/_____
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: August 11, 2014